IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Sylvia Hilgeman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since October of 2009. I am currently assigned to the Minneapolis Field Office, Grand Forks Resident Agency and primarily investigate violent crime in Indian country, in particular crimes which occur on the Spirit Lake Reservation. I have investigated, among others, cases involving assault, domestic assault by strangulation, manslaughter, and murder.

2.      I make this affidavit in support of a criminal complaint charging D'Angelo James Hunt ("**HUNT**"), DOB XX/XX/1999, with violations of Title 18, United States Code, Sections 1111 (Second Degree Murder) and 1153 (Offenses in Indian country) ("**SUBJECT OFFENSE**").

3.      Title 18, United States Code, Section 1111, states murder is the unlawful killing of a human being with malice aforethought.

4.      Title 18, United States Code, § 1153 (Offenses committed within Indian country), provides federal jurisdiction over an Indian who commits a number of offenses against another Indian or other person in Indian country.  The enumerated offenses include murder.

5.      The statements contained in this affidavit are based, in part, on reports about this that I have received, directly or indirectly, from other law enforcement agents; information gathered from physical searches conducted by and photographs taken by law enforcement agents and officers; my own investigation; and my experience, training and background as a Special Agent with the ~~BIA~~ _FBI_.  Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to show that **HUNT** committed the **SUBJECT OFFENSE**.

## FACTS ESTABLISHING PROBABLE CAUSE

6.      On approximately March 15, 2024, the FBI was notified that I.H., brother to **HUNT** was reported missing by his family. I.H. was last seen by someone other than **HUNT** in the late evening of March 2, 2024, or early morning of March 3, 2024, when I.H. and **HUNT** were dropped off at their father's residence.

7.      Three adult witnesses reported picking up I.H. and **HUNT** in the early morning hours of March 3, 2024. One adult female witness ("ADULT FEMALE WITNESS ONE") described that **HUNT** began to hit his head on the front seat of the

Paragraph 5 correction made at agent's request.  11/16/2025

vehicle because **HUNT** was angry because he believed that an adult male ("ADULT MALE WITNESS ONE") was trying to rip off I.H. related to controlled substances. **HUNT** confronted the ADULT MALE WITNESS ONE and tried to strike him. A second adult female witness ("ADULT FEMALE WITNESS TWO") reported that she wanted to leave because she was scared. I.H. pushed **HUNT** from the vehicle. ADULT FEMALE WITNESS ONE saw **HUNT** and I.H. pushing at each other as they pulled away in their vehicle.

8.      Law enforcement conducted a post-<u>Miranda</u> recorded interview of ADULT MALE WITNESS ONE, who was in custody in Fort Totten on an unrelated tribal warrant, which I have reviewed.  ADULT MALE WITNESS ONE corroborated the information provided by ADULT FEMALE WITNESS ONE and said he observed I.H. and **HUNT** fighting a little bit before they went inside of their father's residence, but it appeared to him that I.H. calmed **HUNT** down and they went inside.

9.      On July 10, 2024, Alcohol, Tobacco, and Firearms ("ATF") SA Derek Hill interviewed another male witness ("ADULT MALE WITNESS TWO").  ADULT MALE WITNESS TWO stated that early one morning, likely March 3, 2024, at approximately 3:00 a.m., ADULT MALE WITNESS TWO looked at Facebook and saw two videos posted on I.H.'s Facebook story that he believed were posted between 1 a.m. and 2 a.m.  In the videos, I.H. was holding a phone and recording a video of **HUNT** pacing back and forth.  ADULT MALE WITNESS TWO said that the video was recorded in their father's residence, with which he is familiar.  ADULT MALE

3

WITNESS TWO believed I.H. was seated in the living room area as the video was able to pick up parts of the kitchen. In the videos, ADULT MALE WITNESS TWO heard I.H. saying that **HUNT** was "freaking out" and that I.H. was saying "chill out bro" and "relax". ADULT MALE WITNESS TWO could see **HUNT** pacing back and forth and that he was holding something in his hand.

10.     Another witness, a female sibling of I.H. and **HUNT** ("FEMALE SIBLING ONE"), corroborated the video, said she saw it too, that **HUNT** appeared to by hyperventilating, and that the object **HUNT** was holding was a knife.

11.     Call logs obtained from the Bureau of Indian Affairs Fort Totten Agency show that on March 3, 2024, there was a call for service at 8:21 am on March 3, 2024, from the grandmother of I.H. and **HUNT** who said they were drunk and wanted them removed from her son's nearby residence. The log indicates an officer responded at 9:09 am but no one answered the door.

12.     ADULT FEMALE WITNESS ONE and ADULT MALE WITNESS ONE did not hear from I.H. after that incident.  About five days later **HUNT** asked ADULT FEMALE WITNESS ONE for a ride to town. ADULT FEMALE WITNESS ONE observed **HUNT**'s hand was wrapped up with a white gauze. **HUNT** told ADULT FEMALE WITNESS ONE that I.H. had stabbed him with a knife. **HUNT** told ADULT FEMALE WITNESS ONE that I.H. apologized for cutting him and on March 4 he provided $500 to I.H.

13.     On or about March 26, 2024, law enforcement conducted a recorded interview of **HUNT** regarding I.H.'s disappearance. I have reviewed the interview, and I have included some of the information below:

a.  **HUNT** corroborated that he and I.H. were with ADULT FEMALE WITNESS ONE, ADULT FEMALE WITNESS TWO, and ADULT MALE WITNESS ONE.  **HUNT** barely remembered getting dropped off at his father's residence after because he was drunk. **HUNT** was not sure but noted that I.H. may have still been with ADULT FEMALE WITNESS ONE. **HUNT** said he may have eaten something before falling asleep and waking up the next day. When **HUNT** woke up the next day, he, I.H. and two other minors were in the house.

b.  **HUNT** last saw I.H. on March 7 or 8[1] when **HUNT** provided I.H. with $500 from his recently received federal income tax refund.[2]

---

[1] This is contradicted by Facebook messages obtained in this investigation in which **HUNT** told others that he last saw I.H. on March 4, 2024.

[2]  **HUNT** also told FEMALE SIBLING ONE something similar - that late at night on March 8, **HUNT** provided I.H. with $500, that **HUNT** got for tax returns, because I.H. wanted to borrow it. **HUNT** told FEMALE SIBLING ONE that he provided $500 to I.H. and he "headed out." **HUNT** did not look to see who I.H. left with because he was cleaning.  However, I obtained and reviewed **HUNT**'s tax refund transaction history from H&R Block.  **HUNT** did not receive a refund until March 6, 2024, which was deposited onto an Emerald Debit Card.  There were no cash withdrawals, individual or in sum, totaling $500 from that Card during that timeframe.

c. **HUNT** initially said he and I.H. never really fought and **HUNT** said the cut on his left hand was from an "accident." **HUNT** then said on March 1, **HUNT** and I.H. had an argument and I.H. pulled out a knife on **HUNT** and cut him at their father's house. **HUNT** was not sure what kind of knife was used but noted it was pretty sharp. **HUNT** asserted he received the cut "probably before" **HUNT** and I.H. were cruising around together in ADULT FEMALE WITNESS ONE's car.

d. **HUNT** said I.H. threw a chair at him during the argument and I.H. went toward **HUNT** and cut him. I.H. got scared and left afterwards, however, **HUNT** also told agents that I.H. apologized after the incident and told **HUNT** that he would get him paper towels to clean it. **HUNT** said no one witnessed the fight.

e. **HUNT** told the BIA agents he did not want to tell law enforcement about the incident at first.

f. **HUNT** told the agents the injury they observed on his hand was "wider" after the incident. **HUNT** acknowledged that he was bleeding a lot and blood got on the kitchen floor but made no mention of the living room carpet.

g. **HUNT** also said **HUNT** threw his clothes away in the trash at father's residence because he did not want blood stains on his clothing.

6

14.     On March 1, 2024, two federal search warrants were executed at the father's residence but I.H. had not yet been reported missing.  Then on or about March 6, 2024, when I.H. still had not yet been reported missing, the FBI received a report that a citizen group conducted a search on what the citizens believed to be tribal land behind the father's residence, and a number of items believed to be of investigative interest were located, including a carpet remnant.  That day FBI applied for, obtained, and executed a search warrant for the area outside the father's home and collected those items, among others. One of the items collected at that time appeared to be a carpet remnant stained with what appeared to be dried blood and partially burned. That item was collected by law enforcement and sent to the FBI Laboratory for analysis. The FBI Laboratory was unable to develop a DNA profile from the remnant of carpet or determine the presence of blood because the remnant was contaminated with mold when received.

15.     On March 17, 2024, after I.H. was reported missing, an FBI agent observed a difference in the rugs in the living room from when he was there on March 1, 2024. One rug appeared to be new. When the agent lifted the rug, he observed what appeared to be exposed subfloor where carpet had been cut away. The carpet removed between the March 1 search warrant and the March 17 interview was consistent in color and texture with the remnant seized during the March 6, 2024 search.

16.     The father of **HUNT** and I.H. was in federal custody at the time **HUNT** described. The father said his minor son, a sibling of I.H. and **HUNT** ("MINOR MALE SIBLING ONE"), told him that some of the carpet had been removed after the altercation

and specified that it may have been removed from the living room. The father indicated that the area was covered with a new carpet. The MINOR MALE SIBLING did not know what led to the incident but said **HUNT** was cut by I.H. after they had a disagreement, I.H. cut **HUNT**'s hand, and **HUNT** bled all over the living room. The carpet was torn up because it was full of **HUNT**'s blood. MINOR MALE SIBLING did not remember if **HUNT** told him where I.H. went after the altercation. MINOR MALE SIBLING was interviewed and corroborated the information provided by his father.

17. Law enforcement received, and reviewed patient medical records describing the treatment that **HUNT** received at the Spirit Lake Health Center General Clinic on March 6, 2024. The "chief complaint" indicated **HUNT** had a laceration to his left hand. **HUNT** reported that his brother was drunk and cut him with a knife Sunday morning (March 3, 2024). **HUNT**'s laceration was about .5 cm in length and approximately .5-1cm at its widest point. It was cleaned and treated with steri-strips.

18. On July 3, 2024, I participated in a search of the living room in the father's residence for blood or other evidence in the area where the carpet had been removed, specifically the living room where the carpet was missing, for possible blood using a reagent such as luminol or Bluestar®. The search was aided by North Dakota Bureau of Criminal Investigation Special Agent Troy Kelly and Bureau of Alcohol, Tobacco, Firearms, and Explosives Certified Fire Investigator Special Agent Derek Hill. I have reviewed their reports which document the following:

8

a. Several areas small reddish, brown stains, confirmed by field tests to be blood, on the TV stand/mantle. The blood appeared to have contacted the TV stand in a downward direction.

b. After removing the area rugs around the TV stand, to include the area where the carpet had been removed, as observed law enforcement on March 17, 2024, the agents observed a circular stain in the wood of the subfloor located between the entryway door and the TV stand, near a vent in the floor. The area was treated with BlueStar reagent. Upon applying the reagent, agents observed fluorescence including on the wood subfloor between the entryway door and TV stand, and the wood subfloor in front of the entryway door.

19. Based on the reactions documented upon application of BlueStar, SA Kelly and SA Hill believe the suspected blood settled in the HVAC duct work located along the east interior wall of the structure. I personally observed what appeared to be suspected congealed blood in the duct.

20. Samples of the suspected blood were collected by law enforcement and sent to the FBI Laboratory for testing.

21. The resulting information is summarized as follows:

a. Spots on the tv stand/mantel were identified as blood and developed into a DNA profile and compared to a known sample developed from **HUNT**. It was determined there was very strong support for inclusion (known to me

9

to be the highest expression of support expressed by the DNA unit at the FBI lab) of **HUNT** as a contributor to the sample.

b. Spots on the wood subfloor were identified as blood and a profile originating from one individual was identified. A profile developed from **HUNT**'s known DNA sample was compared to a profile developed from a sample from this area. **HUNT** was excluded as a contributor, however, there was a kinship as some of the markers on the profile are in common with **HUNT**'s. I understood this to indicate that the profile developed from the sample was a relative of **HUNT**'s. MINOR MALE SIBLING and their father were excluded as contributors to the profile.

22. I later obtained a toothbrush that family members identified as belonging to I.H. There was male DNA profile developed from the toothbrush, interpreted as originating from one individual. The male DNA profile was compared with the profiles developed from samples taken from the subfloor. There was very strong support for inclusion of the male DNA from the toothbrush (identified as I.H.'s). It was expressed as being 41 quintillion times more likely if I.H. is the contributor than if an unknown, unrelated person is the contributor.

23. Since I.H. was reported missing, numerous physical searches have taken place by law enforcement and the community and numerous search warrants have been executed but none resulted in evidence of I.H.'s location

24.     On November 15, 2025, during a community search for I.H., family members identified what appeared to be a human skull behind **HUNT** and I.H.'s father's residence.  Family provided information that **HUNT** had been staying at the father's residence for the past ten days.

25.     Law enforcement was notified, and the scene was secured.  On November 16, 2025, members of the FBI's Evidence Response Team conducted a search of the area pursuant to a search warrant.  Additional human remains were recovered during the search.  The shoes and clothing items present on the remains were consistent with the items I.H. was described by witnesses as I.H. wearing at the time he was last seen. I also observed them to be the same shoes and jeans I.H. was wearing on footage from his grandmother's nearby home on March 2, 2024.

26.     I received records from BIA Realty which confirmed that **HUNT**'s father's residence, where the incident involving the knife and the human remains were recovered, is within the exterior boundaries of the Spirit Lake Reservation.

27.     I also requested and obtained enrollment records from the Spirit Lake Tribe for **HUNT** and I.H. The records verified both are enrolled members of the Spirit Lake Tribe.

## CONCLUSION

28.     Based on the information detailed above, I respectfully submit there is probable cause to charge **HUNT** with violations the **SUBJECT OFFENSE** as articulated in **Attachment A** to this affidavit.

11

Respectfully submitted,

Sylvia Hilgeman
Special Agent
Federal Bureau of Investigation

Sworn to before me on the 16th Day of November 2025, by reliable electronic means.

Alice R. Senechal
UNITED STATES MAGISTRATE JUDGE